Professional Conduct Committee
No. LD-2011-010

# CLAUSON'S CASE

Argued: June 14, 2012
Opinion Issued: September 18, 2012

*James L. Kruse*, of Concord, on the brief and orally, for the professional conduct committee.

*Clauson & Atwood*, of Hanover (*K. William Clauson* on the brief and orally), for the respondent.

LYNN, J. The respondent, K. William Clauson, appeals an order of the Supreme Court Professional Conduct Committee (PCC) suspending him from the practice of law for six months based upon its finding that he violated New Hampshire Rules of Professional Conduct (Rules) 1.1, 1.7, 1.9(a), and 8.4(a). Because we find that the respondent violated only Rules 1.7 and 8.4(a), we affirm in part, reverse in part, vacate in part, and remand.

I

The record supports the following facts. On June 20, 2009, Todd Gray was arrested for assault arising out of an incident that occurred early in the morning of June 14, 2009, at the home he shared with his wife Brenda and their children. In the supporting affidavit for the arrest warrant, State Trooper Nathan Hamilton stated that he learned the following in the course of investigating the incident. Mr. and Mrs. Gray attended a graduation party in Vermont on the night of June 13 and became intoxicated. Mrs. Gray told Hamilton that, after returning home with their daughter Amber, a dispute arose during which Mr. Gray broke a bathroom mirror, threw furniture over, and slapped Mrs. Gray in the face. Mr. Gray later told Hamilton that he had punched the mirror in response to his wife's "bickering," and that she had scratched him on the side of the neck. Some time after speaking with Mrs. Gray, Hamilton located Amber and asked her what happened. She said that after hearing the sound of the mirror breaking, she approached the bathroom and had "some words" with her father, and in response he backed her into a wall and slapped her in the face. After that, according to Amber, Mrs. Gray approached Mr. Gray and slapped him on the back of the head; Mr. Gray then threw Mrs. Gray into a refrigerator, table, and chair, slapped her, and, after Amber called the police, left the house. Trooper Hamilton returned to obtain a written statement from Mrs. Gray later on June 14, but she declined to provide one and said she did not want the investigation to proceed.

After his arrest on June 20, Mr. Gray appeared before a bail commissioner, who released him on $500 personal recognizance and ordered him not to contact Mrs. Gray or Amber or go within 100 yards of them. On June 22, Mrs. Gray sought the respondent's assistance in lifting the no-contact condition of the bail order so that Mr. Gray could return home. The respondent, an attorney licensed to practice in New Hampshire since 1971, agreed to represent her in the matter. After speaking with Mr. Gray by telephone to obtain his consent to appear in the district court on his behalf, the respondent filed a motion entitled "Brenda Gray and Todd Gray's Emergency Motion for Immediate Hearing on Bail Conditions." The respondent appeared with Mrs. Gray for a hearing on the motion on June 23 in the Lebanon District Court (*Cirone*, J.). He told the court that Mrs. Gray did not consider herself a victim in the case and wanted the no-contact condition lifted. The court, however, declined to rule on the matter because Mr. Gray was not present.

On June 30, the respondent again appeared on behalf of the Grays to request the no-contact condition be lifted. Mr. Gray was also arraigned at that hearing and entered a not guilty plea through the respondent, who had by that time agreed to represent him in the criminal case. At some point, the court expressed its concern that the respondent's joint representation of the Grays presented a possible conflict of interest. Mrs. Gray then testified that she was not afraid of her husband and wanted him to return home, and engaged in a discussion with the court about the matter. Mr. Gray did not speak during that hearing. The court issued an order the next day lifting the no-contact condition of the bail order.

The respondent represented Mr. Gray in his criminal case. After the court scheduled a trial to take place in November, the State agreed to place the charges on file for one year without a finding, conditioned on Mr. Gray's good behavior and completion of an anger management course.

The Attorney Discipline Office issued a notice of charges against the respondent in August 2010 alleging violations of Rules 1.7(a), 1.9(a), 1.1, and 8.4(a). A hearing panel found that the respondent violated each Rule as charged and recommended: (1) a sanction of three months suspension; (2) a requirement to take the Multistate Professional Responsibility Exam (MPRE) and earn a 90% passing score; (3) attendance at twelve hours of continuing education seminars; and (4) payment of all expenses incurred in the investigation and prosecution of the matter. After hearing oral argument, the PCC found violations of each of the Rules, as charged, issued a six-month suspension, and required the respondent to complete an MPRE course and pass the examination. The respondent appealed.

## II

We first consider whether the respondent violated the Rules. The PCC's finding of a violation must be supported by clear and convincing evidence. SUP. CT. R. 37A(III)(d)(2)(C). "In attorney discipline matters, we defer to the PCC's factual findings if supported by the record, but retain ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, what the sanction should be." *Clark's Case*, 163 N.H. 184, 187-88 (2012).

### A. Concurrent Conflict of Interest

The PCC first concluded that the respondent violated Rule 1.7(a), which provides:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . .

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

Comment 8 to the ABA Model Rules explains further:

Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's

other responsibilities or interests . . . . The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself require disclosure and consent. The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.

N.H. R. PROF. CONDUCT 1.7, ABA Model Code Comment 8.

Because the respondent does not contend that he obtained informed, written consent, our analysis is limited to whether his representation of Mr. and Mrs. Gray presented a significant risk that his representation of one would be materially limited by his responsibilities to the other.

The respondent advances several arguments as to why his representation of the Grays did not violate Rule 1.7: (1) that their respective interests were aligned insofar as each wanted the no-contact order lifted; (2) that his representation of Mr. Gray in the underlying criminal case was contingent upon his review of the police file; and (3) that because both Mr. and Mrs. Gray denied that the alleged assault even occurred, his representation of each would never be materially limited by his responsibilities to the other.

█ The first argument is unpersuasive because it pertains to the *actual* alignment of the Grays' interests — not the *risk* that the respondent's responsibilities to one would materially limit his representation of the other. *See Wyatt's Case*, 159 N.H. 285, 298 (2009) (Rule 1.7(b) (the former version of Rule 1.7(a)(2)) "is broad, and focuses not upon direct adversity at the outset, but the risk that it or other material limitations may arise in the course of the dual representation" (citation omitted)); *see also* R. FLAMM, LAWYER DISQUALIFICATION § 4.1, at 61 (2003) ("In a situation where a lawyer concurrently represents two or more parties with respect to the same subject matter there is usually a chance that their interests will, at some point, diverge.").

The second argument is also unpersuasive because the PCC found that the respondent represented Mr. Gray in the general criminal case *before* the June 30 hearing. The record supports that finding, particularly given that the respondent entered a not guilty plea on Mr. Gray's behalf at the June 30 hearing. Moreover, the finding of a concurrent conflict may be predicated solely upon the respondent's representation of the Grays in the two hearings convened for the purpose of lifting the no-contact condition of the bail order. Whether or not we accept that the respondent's representation of Mr. Gray on the criminal assault charge was contingent upon

receiving and reviewing the police file, it is undisputed that the respondent represented *both* Mr. and Mrs. Gray at the bail hearings. Because there is no evidence in the record that the respondent provided Mrs. Gray with any additional legal services after the June 30 hearing, we limit our analysis of Rule 1.7 to the two hearings on the bail conditions.

■ ■ We conclude that the joint representation presented several significant risks that the respondent's responsibilities to Mrs. Gray would materially limit his representation of Mr. Gray. First, the respondent's responsibilities to Mrs. Gray included an obligation to offer candid and independent advice which, if given, could have conflicted with Mr. Gray's interest in removing the no-contact provision and defending against the underlying assault charge. For example, the respondent knew that Mrs. Gray had an obligation to tell the truth in the bail hearing. A disinterested lawyer might have examined the facts, explained to Mrs. Gray the risks of telling the court that the assault never happened notwithstanding substantial evidence to the contrary, and, accordingly, advised her to refrain from denying the assault took place. Similarly, a disinterested lawyer might have foreseen a possibility that Mrs. Gray would change her mind and opt later to proceed as a willing witness for the prosecution. In that event, prudence might also dictate advising her to refrain from supporting removal of the no-contact order lest she later face exposure to cross-examination based upon her prior statements to the court (a possibility made even more pronounced in light of her having told Trooper Hamilton on the night of the incident that Mr. Gray had, in fact, assaulted her). But providing such advice obviously would have been detrimental to Mr. Gray's interest in lifting the no-contact condition and defending against the criminal case. This situation presented the primary risk arising from a concurrent conflict of interest under Rule 1.7(a)(2): divided loyalties that might inhibit the lawyer's range of options in advising a client. *See* N.H. R. PROF. CONDUCT 1.7, ABA Model Code Comment 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."); *cf. Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) (In a conflict situation, "the evil . . . is in what the advocate finds himself compelled to *refrain* from doing."); *Barefield v. DPIC Companies, Inc.*, 600 S.E.2d 256, 269 (W. Va. 2004) ("An attorney should not be permitted to put himself in a position where, even unconsciously, he will be tempted to 'soft pedal' his zeal in furthering the interests of one client in order to avoid an obvious clash with those of another." (quotations omitted)).

■ The respondent's responsibilities to Mrs. Gray could also materially limit his representation of Mr. Gray were the case against him to proceed to trial. At trial, the respondent's obligation to Mr. Gray would be to

cross-examined witnesses against him as vigorously as possible. Yet his ability to cross-examine Mrs. Gray — an inevitable witness for the prosecution — would be limited by Rule 1.9(c)(2), which prohibits a lawyer who has "formerly represented a client in a matter" from revealing information "relating to the representation." Rule 1.7(a)(2) expressly applies to such a situation by virtue of its reference to a lawyer's "responsibilities to . . . a former client." Although Rule 1.6 would allow the respondent to reveal such information if he obtained Mrs. Gray's informed consent, the fact that she supported lifting the no-contact order on June 30 did not make her continued support of her husband a foregone conclusion. In the event that Mrs. Gray withheld her consent to allow the respondent to use information "relating to the representation" — information he presumably obtained when he initially interviewed her about the matter — the respondent could not effectively advocate on behalf of Mr. Gray and would likely be forced to withdraw.

█ The foregoing discussion makes clear that the respondent's third argument — that because the Grays denied the assault took place meant "there could be no occasion when . . . [the respondent's] representation would be 'materially limited' by his responsibilities to each" — also lacks merit. Whether or not the respondent was in fact satisfied that there was no assault, his loyalties to Mr. Gray in seeking to lift the no-contact order and defend him against the charged crime could have compromised his ability to provide independent and disinterested advice to Mrs. Gray. *See In re O'Brien*, 26 A.3d 203, 209 (Del. 2011) ("Rule 1.7(a) is an objective standard and does not rely upon the lawyer's subjective belief about his ability to remain impartial."). The risk that the respondent's loyalties would be divided was made even more palpable by the evidence the police had collected against Mr. Gray, including that Mrs. Gray told Trooper Hamilton that Mr. Gray had hit her and that Amber told Hamilton that Mr. Gray had not only hit Mrs. Gray, but also pushed her into a table and a refrigerator. The respondent's ability to counsel Mrs. Gray either to stay silent at the bail hearing or to reconsider her support for her husband given that the State was pursuing the charges against him was impaired by his obligation to advocate effectively for Mr. Gray. *See* N.H. R. PROF. CONDUCT 1.7, ABA Model Code Comment 8. Thus, we agree with the PCC that clear and convincing evidence supports a finding that the respondent violated Rule 1.7(a)(2) when he represented both Mr. and Mrs. Gray.

The PCC also determined, without elaboration, that this conflict was unwaivable because the respondent could not have "reasonably believed" that he could provide effective and diligent representation notwithstanding the conflict. *See* N.H. R. PROF. CONDUCT 1.7(b)(1). This conclusion was

unnecessary to the disposition of the matter because it is undisputed that the respondent did not obtain informed consent under Rule 1.7(b)(4). Thus, we need not address it.

Because the respondent violated Rule 1.7(a), he also violated Rule 8.4(a), which provides: "It is professional misconduct for a lawyer to . . . violate . . . the Rules of Professional Conduct . . . ." *See Wyatt's Case*, 159 N.H. at 306.

## B. Successive Conflict of Interest

█ The PCC also found that the respondent violated Rule 1.9(a). That rule provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Rule 1.9 protects former clients by recognizing "the twin duties an attorney owes to a former client: [t]he duty to preserve confidences and the duty of loyalty." *Wyatt's Case*, 159 N.H. at 304. A violation of Rule 1.9(a) consists of four elements: a valid attorney-client relationship between the attorney and the former client; materially adverse interests between the former client and a present client; representation of the present client in the same or a substantially related matter; and a lack of consent on the part of the former client. *Id.* at 304-05.

█ The PCC's finding of a Rule 1.9(a) violation lacks clear and convincing evidence in the record. Even accepting that the criminal case was a "matter" the same as or substantially related to the bail hearing, Mrs. Gray appeared to have *opposed* the criminal case against her husband throughout the respondent's brief representation of Mr. Gray. *Cf. Wyatt's Case*, 159 N.H. at 305 (material adversity present where attorney formerly represented client in guardianship proceedings and subsequently represented conservator attempting to establish permanent guardianship over client, against former client's wishes). Thus, her interests cannot be said to have been adverse to Mr. Gray's interests at all, much less "materially" so.

█ Moreover, to the extent that the PCC found a violation of Rule 1.9(a) based upon a *risk* of a conflict arising, such an interpretation is inconsistent with the rule's text. Rule 1.9 is directed not at attorneys facing a *possibility* that the representation of one client could be infringed by a lawyer's other responsibilities, but at those attorneys whose client's interests in a current matter are *in fact* materially adverse to those of a former client in the same

or a substantially related matter. Indeed, to the extent that the PCC's finding of a Rule 1.9(a) violation was predicated on a risk of divergent interests arising, Rule 1.7(a)(2) expressly contemplates such risks by its reference to situations in which a lawyer's responsibilities to "a former client" might materially limit the representation of one or more clients. Rule 1.9 refers not to possibilities but to actual adverse interests. Accordingly, although we might be inclined to find a Rule 1.9 violation had Mrs. Gray changed her position about the alleged assault, the undisputed facts do not support the PCC's finding of a successive conflict.

## C. Competence

Finally, the PCC found that the respondent was incompetent under Rule 1.1: "A lawyer shall provide competent representation to a client." N.H. R. PROF. CONDUCT 1.1(a). Rule 1.1(b) establishes the minimum requirements for legal competence:

> (1) specific knowledge about the fields of law in which the lawyer practices;
>
> (2) performance of the techniques of practice with skill;
>
> (3) identification of areas beyond the lawyer's competence and bringing those areas to the client's attention;
>
> (4) proper preparation; and
>
> (5) attention to details and schedules necessary to assure that the matter undertaken is completed with no avoidable harm to the client's interest.

*Id.* 1.1(b).

The PCC determined that the respondent violated Rule 1.1 as to both clients in the matter of removing the no-contact order. The PCC did not conclude that the respondent's representation of Mr. Gray in the subsequent criminal case against him constituted a Rule 1.1 violation.

 We conclude that there was not clear and convincing evidence of a violation of Rule 1.1. The PCC's decision rested on four grounds, which we address in turn. First, the PCC concluded that the respondent lacked the "requisite knowledge and expertise" to represent Mr. Gray in the bail condition hearing.

> In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience

in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question.

N.H. R. PROF. CONDUCT 1.1, ABA Model Code Comment 1. The PCC's ruling does not explain why the respondent, an attorney practicing law in New Hampshire since 1971, was unqualified to assist the Grays in such a limited representation as a bail modification hearing, nor does it explain why his actions rose to the level of incompetence. *Cf. Attorney Grievance v. Gisriel*, 974 A.2d 331, 351-52 (Md. 2009) (attorney incompetent for failing to respond to motion to dismiss). The scope of that representation was limited to the relatively simple objective of removing the no-contact order. Although the respondent lacked significant *general* criminal law experience, the legal objective for which the Grays hired him — to remove the no-contact order placed upon Mr. Gray — did not require highly specialized knowledge or skill. *See In re Richmond's Case*, 152 N.H. 155, 158 (2005) ("[E]xpertise in a specific area of law generally is not required in order to meet the minimum standards for competency under Rule 1.1."). Indeed, the respondent's June 23 appearance, though unsuccessful, appears to have been reasonably calculated to accomplish Mrs. Gray's stated desire to be reunited with her husband as soon as possible. Moreover, the respondent was successful both in lifting the no-contact order a week later at the June 30 hearing and in negotiating a plea which resulted in Mr. Gray avoiding trial. The PCC's determination on this point lacks clear and convincing evidence that the basic level of proficiency required was more than that of a "general practitioner." *See* N.H. R. PROF. CONDUCT 1.1, ABA Model Code Comment 1.

 Second, the PCC concluded that the respondent's first appearance before the court on behalf of Mrs. Gray violated "the rules of the tribunal" because Mr. Gray was required to be present for that hearing. The PCC cites Rule 3.4(c), which provides that a lawyer "shall not . . . knowingly disobey an obligation under the rules of a tribunal." The relevant rule of the district court, however, requires the defendant's presence at the "arraignment, at every stage of the trial, and at the imposition of the sentence." DIST. DIV. R. 2.3. The June 23 hearing on the motion to lift the no-contact provision was neither an arraignment nor sentencing, and cannot reasonably be construed as a "stage of the trial" because trial had not yet begun. Thus, the respondent did not knowingly violate District Division Rule 2.3.

Contrary to the PCC's conclusion that the respondent "failed to understand that Mrs. Gray was not a party to the criminal case and did not have standing" to challenge the no-contact order, we have found no legal

authority for the proposition that the purported victim protected by a no-contact order in a domestic violence case cannot, at the very least, request an opportunity to be heard with respect to an aspect of the order that affects her, notwithstanding that she is not a named party to the case. Judge Cirone acknowledged as much in his testimony before the PCC when he stated that it was his practice to grant requests to waive the defendant's presence when a person seeks to lift a no-contact order. Moreover, even assuming that Mrs. Gray did not have standing to make such a request, the respondent's June 23 appearance was on behalf of *both* Mr. and Mrs. Gray. Thus, we reject the PCC's determination that the respondent's June 23 attempt to have the no-contact order lifted amounted to incompetent representation.

Third, the PCC ruled that the respondent "failed to investigate" and, therefore, did not understand the "respective interests of Mr. and Mrs. Gray." The record does not support this conclusion. Rather, it indicates that the respondent spoke with both Mr. and Mrs. Gray and had objectively reasonable grounds to believe that their interests were aligned. He also spoke with Trooper Hamilton, who supported the Grays' attempt to lift the no-contact condition and accompanied the respondent and Mrs. Gray to the June 23 hearing for that purpose. Moreover, "[t]he required attention and preparation are determined in part by *what is at stake*; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence." N.H. R. PROF. CONDUCT 1.1, ABA Model Code Comment 5 (emphasis added). Here, the only thing at stake in the initial representation was whether the no-contact condition of Mr. Gray's bail order would remain in effect. The circumstances surrounding Mrs. Gray's request to seek immediate removal of the no-contact order did not lend themselves to a more extensive investigation into the facts. Given the limited nature of the representation and the short period of time the respondent had to achieve the objective of reuniting Mrs. Gray with her husband, we reject the PCC's conclusion that the respondent conducted an insufficient investigation under the circumstances.

The PCC also stated that the respondent "failed to evaluate the actual or potential conflicts of interest." To the extent that this finding served as an independent basis for a Rule 1.1 violation, it may be true that, in some circumstances, a gross and inexcusable failure to evaluate a potential conflict of interest constitutes incompetent representation in violation of Rule 1.1. Here, however, the limited nature and scope of the initial representation — seeking to lift the no-contact provision — might have led

even competent counsel to mistakenly believe that any risk of a conflict arising under Rule 1.7 was not "significant." *See* N.H. R. PROF. CONDUCT 1.7(a)(2).

Finally, the PCC determined that the respondent "placed Mr. Gray at risk of being in violation of the no contact order" because he "facilitated communications" between Mr. Gray and Mrs. Gray. The bail order states that the defendant "shall have no contact with Brenda Gray . . . by mail, telephone or otherwise." Notwithstanding the PCC's determination that the respondent put Mr. Gray at risk of violating that condition through his joint representation at the bail condition hearings, the record lacks competent evidence to establish that the respondent placed Mr. Gray at risk of violating the order by contacting Mrs. Gray on Mr. Gray's behalf. *Cf. State v. Kidder*, 150 N.H. 600, 603 (2004) (in related context of RSA 173-B:4 (2002), holding that a defendant "may properly be found guilty of violating a protective order when he knowingly contacts the victim through an attorney"); RSA 173-B:5-a (Supp. 2011) (establishing parameters for permissible contact post-*Kidder*). Although the rule from *Kidder* might support an inference that the respondent would have treaded close to the line of impermissible contact had he acted on Mr. Gray's behalf in reaching out to Mrs. Gray, neither the PCC's order nor its brief cites any facts indicating that Mr. Gray so directed him or that he so obliged.

In light of the foregoing, we conclude that the PCC lacked clear and convincing evidence that the respondent violated Rule 1.1.

### III

The PCC based the respondent's six-month suspension on his violation of Rules 1.1, 1.7(a), 1.9(a), and 8.4(a). We have found, however, that there was clear and convincing evidence that he violated only Rules 1.7(a) and 8.4(a). We cannot be confident that the PCC's sanction would have been the same had it correctly recognized the extent of his violations of the Rules. Accordingly, we vacate the sanction and remand to the PCC to reconsider the appropriate sanction.

*Affirmed in part; reversed in part; vacated in part; and remanded.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.